[Crim. No. 21575. Second Dist., Div. Five. May 18, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
LEO GUERRERO AGUILAR, Defendant and Appellant.

## Counsel

Helen E. Simmons, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KAUS, P. J.**—An amended information charged defendant with the murder (Pen. Code, § 187) of Hector J. Solis. It also charged that the defendant, in committing the offense, used a firearm. (Pen. Code, § 12022.5.) After lengthy deliberations a jury found defendant guilty of second degree murder. The firearm charge was found to be true. Defendant appeals.

### Facts

The homicide occurred during the night between June 23 and June 24, 1971. There is no question that defendant killed Solis with defendant's own .22 semi-automatic pistol in the garage of his residence. There is

also compelling evidence that Solis had been carrying on an affair with defendant's wife and that defendant knew about it. Unquestionably when defendant and the victim somehow faced each other in defendant's garage, the atmosphere was charged. As the evidence developed the sole question became whether defendant murdered the victim or killed him in self-defense.

On June 23 defendant was upset and crying. He said that he did not want to leave and that he loved his wife and children very much. Defendant and Solis arranged by telephone that Solis should come over for a talk.

At about 2:51 a.m. Mrs. Aguilar called the police and reported a shooting. Somebody who identified himself as defendant said over the telephone that he had shot the victim over a family argument. The police arrived at defendant's residence about an hour later. Solis' body was found in a supine position. It was warm to the touch. Later, when it was moved, an unlit filter tip cigarette was found under the body. The .22 pistol was on the floor at the victim's right side. One live round was in the chamber and two in the magazine. The hammer was down but there was no firing pin mark on the remaining live round, indicating that the hammer had been carefully released and placed in the down position. An unlit match from a book of paper matches was found near the body. A book of matches was found in the victim's shirt pocket. Microscopic analysis indicated that the match had been torn from that particular book. With the exception of the body of the victim, nothing in the garage indicated that there had been an altercation. Nothing about the defendant's person showed that he had been in a fight. No "defensive wounds" were observed on the victim's hands.

When the police first arrived at the scene and an inquiry was made as to what happened, defendant said: "I did it." He was calm.

The pathologist's testimony indicated that four different bullets had caused six different wounds to the victim, one bullet having passed through one of his hands and then entered his chest. Two other bullets entered the chest directly. A fourth bullet entered the head from the back and was found on the left front of the head.

The defense was, essentially, self-defense. To defendant's knowledge the victim was a karate expert, fond of demonstrating his ability to break boards with his fists or feet. He would explain that he could break a man's neck in the same fashion. He had a short temper. On the night of the homicide Solis came to defendant's house to talk to him. He came with defendant's wife who had not been home for dinner. The two men went to

the garage. Solis said: "Look, you son of a bitch, . . . I just got through laying your wife again, and I want you to divorce her or I will kill you, and I will get your daughter next." He produced a motel key. He then hit defendant across the chest with a karate chop. Defendant was knocked across some shelves and reached for the gun which he had kept in the garage. He told the victim to leave him and his wife alone. The victim cried "like a wild animal" and charged at defendant with a side kick, turning his head to the left. Defendant cocked the gun and fired until the victim dropped.

## DISCUSSION

On appeal defendant makes six contentions:

1. The evidence was insufficient to sustain the conviction.

2. The prosecution improperly referred to prior acts of misconduct by defendant.

3. The jury was improperly coerced to reach a verdict.

4. The court erred in not instructing the jury on manslaughter.

5. The additional sentence pursuant to section 12022.5 of the Penal Code denies defendant equal protection and constitutes excessive, cruel or unusual punishment.

6. The prosecution improperly offered evidence that defendant, after he had been arrested, did not claim to have acted in self-defense.

### I.

■ Though counsel on appeal makes a valiant effort to reargue the evidence, we cannot possibly say that it does not support the verdict. No particular purpose would be served by detailing it further. Suffice it to say that pursuant to the provisions of section 1105 of the Penal Code, as interpreted by many decisions, the People had clearly made out a case of second degree murder. (See generally, *People* v. *Loggins,* 23 Cal.App.3d 597 [100 Cal.Rptr. 528].) The jury was instructed and reinstructed that the defense evidence on self-defense only had to raise a reasonable doubt as to defendant's guilt of murder. It is evident that defendant did not succeed in doing so.

### II.

■ One John Miramontes, a close friend of defendant who had known him for eight years, described him as "not very aggressive," "not hot tempered," and "always real calm." He further testified that he had dis-

cussed defendant's character for aggressiveness, temper and their opposites with other people in the community. Defendant's reputation was good and the witness had never heard of him getting excited or being in a fight. The victim, on the other hand, was an aggressive loudmouth. On cross-examination Miramontes was asked the two questions copied in the footnote.[1] No objection was made. The witness answered both questions in the negative.

In view of the lack of an objection below, we probably should not discusse the matter further. In form the questions fit the classic mold of impeachment of character witnesses. (See generally, *Michelson* v. *United States*, 335 U.S. 469 [93 L.Ed. 168, 69 S.Ct. 213]; *People* v. *Eli*, 66 Cal.2d 63, 78-80 [56 Cal.Rptr. 916, 424 P.2d 356].) While perhaps some question might be raised concerning the possible relevance of rumors concerning the 1959 incident in Chicago, it would be impossible to say that any prejudice resulted.

Defendant claims that he was not permitted to explain the alleged incidents, citing *People* v. *Zerillo*, 36 Cal.2d 222, 230 [223 P.2d 223]. The principle referred to in *People* v. *Zerillo, supra,* has nothing to do with this case. There evidence of other crimes was admitted on the merits. Here the questions were asked for the sole purpose of testing the character witness. The court instructed the jury concerning the limited purpose for which the evidence had been admitted. (CALJIC No. 2.42.) There was no error.

### III.

It cannot be gainsaid that it took the jury a long time to reach its verdict. The case was placed in its hands on the Wednesday before Thanksgiving, 1971, and it did not have a verdict until the late afternoon of Wednesday, December 8. Thus 15 calendar days elapsed from submission to verdict. On six of those, however, the jury did not deliberate.

A day-by-day summary of what happened will be found in the footnote.[2]

---

[1] "Now, Mr. Miramontes, have you heard that, on February 15, 1959, in Chicago, Mr. Aguilar was arrested by the Chicago Police on a charge of disorderly conduct on a Complaint brought by his wife?"

"And have you heard that, on May 12, 1968, in Desert Hot Springs, California, at approximately 4:15 in the morning, the police were called to a trailer park where Mr. Aguilar had his trailer parked on a Complaint that Mr. Aguilar had been beating someone's daughter and threatening her with a gun?"

[2] *Wednesday, November 24:* 9:40 a.m. Jury starts deliberations. Excused at 4 p.m.

*Monday, November 29:* Jury deliberates until 1:50 p.m. Certain testimony reread until 3:37 p.m. Jury excused at 4:07 p.m.

The following matters are noteworthy:

1. The jury was not sequestered. Coercion because of threatened further separation from home and family therefore does not enter the picture.

2. In a sense the deliberations started anew when an alternate juror started to take part on December 1.

3. When the jury declared itself hopelessly deadlocked just before being excused on December 2, the court, in excusing it for the evening, exerted no pressure whatever and merely suggested that a good night's rest, preceded by "an old T.V. movie" might be a good thing and that it would be "to the benefit of all parties for you to make your best effort to resolve this matter."

4. At no point thereafter was the court again informed that things were "hopeless." Each further announcement of a deadlock was coupled with some expression of optimism.

5. Never was there a hint whether the majority of the jury was voting to convict or to acquit.

6. It is difficult to tell from the record we have what additional instruction or instructions were given on December 6. The instructions given on December 7, however, hardly favored the prosecution. While they did stress that there was no reason to suppose that the case would look different to another jury, they also emphasized—in no uncertain words—the Peo-

---

*Tuesday, November 30:* Jury starts deliberations at 9 a.m. Further testimony reread 3:20-3:50 p.m. Jury excused.

*Wednesday, December 1:* One juror having reported sick, an alternate juror is substituted. Rereading of testimony resumes. Jury deliberates balance of day and is excused at 3:50 p.m.

*Thursday, December 2:* Jury deliberates 9 a.m. to 3:19 p.m. Declares itself "hopelessly deadlocked." Is excused at 3:19 p.m.

*Friday, December 3:* Jury starts deliberating at 9 a.m. At 10:12 a.m. foreman gives pessimistic report to court, but states that jury is rereading instructions. Court instructs jury to proceed. At 2:45 p.m. foreman announces that jury stands 8 to 4 and declares possibility that vote might change slightly if additional testimony is reread. Jury excused for weekend at 2:52 p.m.

*Monday, December 6:* Testimony of ballistic expert reread 9:45-10:17 a.m. Jury deliberates until 3:10 p.m. Reports no change in numerical division. Further instructions given. At 5 p.m. jury reports "some progress." Excused until next day.

*Tuesday, December 7:* Jury starts deliberating at 9:30 a.m. Jury is further instructed at 11:05 a.m. Jury deliberates 11:15 a.m. to 4:30 p.m. when progress is reported. Jury is excused at 4:33 p.m.

*Wednesday, December 8:* Jury starts deliberating at 9:30 a.m. Defense moves for mistrial at 3:55 p.m. Motion is denied. Jury has verdict at 4:10 p.m.

ple's burden to "establish every part of [their case] beyond a reasonable doubt." The court also pointed out again that defendant's evidence concerning self-defense only had to raise a reasonable doubt in order to entitle him to an acquittal.

It should be further observed that for the reasons discussed in the next part of this opinion the jury's task was an unusually difficult one. Defense counsel had very adroitly painted such a picture of the victim that the jury may well have thought that in disposing of him defendant had rendered a public service, regardless of what they objectively felt had happened just before the fatal shots were fired.

We find no coercion.

## IV.

It may well be that the range of the evidence would have justified an instruction on manslaughter. (*People* v. *Modesto,* 59 Cal.2d 722, 727-731 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Miller,* 57 Cal.2d 821, 829-830 [22 Cal.Rptr. 465, 372 P.2d 297].) We need not pause to examine that point. The record indicates that at one point defendant requested over a dozen instructions which dealt with voluntary and involuntary manslaughter in one way or another. All are marked "withdrawn." Neither transcript indicates the circumstances under which they were withdrawn.

In our opinion it thus sufficiently appears that the error, if any, was invited. (*People* v. *Phillips,* 64 Cal.2d 574, 580, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353]; cf. *People* v. *Newton,* 8 Cal.App.3d 359, 378-381 [87 Cal.Rptr. 394].)

The tactical reasons for not wanting the jury to have a manslaughter option are obvious: the proof presented the jury with a hard choice between the physical evidence and defendant's version of the events. The legend of the "unwritten law" dies hard. A manslaughter compromise may well have seemed not just in the cards, but a strong probability. Yet from the point of view of duration of actual incarceration, it may have made little difference to defendant whether he went to prison as one convicted of manslaughter or as a murderer.

As far as we are concerned the record fairly compels the conclusion that the withdrawal of the manslaughter instructions was a tactical decision which, unfortunately from the defense point of view, backfired.

## V.

■ Defendant claims that section 12022.5[3] is unconstitutional, at least as applied in a case such as this, in that it impermissibly distinguishes between those murderers who use firearms on their victims and those who use other means.[4]

Defendant's point assumes that, when applied to murder or attempted murder, section 12022.5 demands that a firearm be the means by which the accused kills or attempts to kill his victim. We need not decide whether that interpretation of the section is correct. We do point out, however, that the language of section 12022.5 does not demand it. Of course, if defendant's interpretation is wrong, his point merits no further discussion.

Assuming defendant's interpretation to be correct, it is, of course, undeniable that the victim of a murder is no more dead if he had been shot than if he has been poisoned, smothered or drowned. The purpose of the statute is, however, at least partly prophylactic: to cause fewer people to be murdered in the first place. When certain properties of firearms are considered in combination, it becomes obvious that section 12022.5 is based on a rational distinction, even when applied to murder: 1. the disadvantage of the unarmed victim vis-à-vis the murderer who "has the drop" on him; 2. the peculiarly lethal nature of firearms; and 3. the relative speed with which a potential killer armed with a firearm can execute an intent to kill, once it is formed. (See generally *People* v. *McDaniels,* 25 Cal.App.3d 708, 712-716 [102 Cal.Rptr. 444].)

## VI.

■ Defendant's last contention—that the prosecution improperly offered evidence that he did not claim self-defense after his arrest—was suggested by us after our initial review of the record. The point was

---

[3]Section 12022.5: "Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, rape, burglary, or kidnapping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence. . . . This section shall apply even in those cases where the use of a weapon is an element of the offense."

[4]Defendant also claims that the punishment prescribed by section 12022.5 is excessive, cruel and unusual. No argument in support of these claims is made and we therefore do not discuss them.

then informally briefed by both sides. After a more thorough study of the entire record, we have come to the conclusion that counsel for defendant was quite right in not urging the matter in the first place.

There is no doubt that on two occasions the People, over appropriate objection, offered evidence that defendant failed to claim self-defense after he was arrested for murder and either was, or should have been, advised of his constitutional rights. (*In re Banks,* 4 Cal.3d 337, 351-352 [93 Cal. Rptr. 591, 482 P.2d 215].) Standing alone these rulings were error.

The error was, however, harmless beyond a doubt. The record contains several references to defendant's failure to claim self-defense. These came into the record without objection, either because they were not subject to objection (*People* v. *Manasse,* 153 Cal. 10, 13-14 [94 P. 92]) or because counsel did not object.

The judgment is affirmed.

Stephens, J., and Cole, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1973.

---

*Assigned by the Chairman of the Judicial Council.