[Crim. No. 20509. First Dist., Div. Two. Mar. 9, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ROBERT PACHECO, Defendant and Appellant.

618

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Isadora W. Lomhoff, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Thomas A. Brady and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TAYLOR, P. J.**—Defendant, John Pacheco, appeals from a judgment entered on a jury verdict finding him guilty of second degree murder (Pen. Code, § 187) and use of a deadly weapon (Pen. Code, § 12022, subd. (b)). He contends that: 1) the evidence is insufficient to support the judgment and the verdict; 2) he was deprived of his Sixth Amendment right to trial by a representative cross-section because the court "death qualified" the jury and, in any event, a jury so chosen is not impartial; and 3) the court committed reversible error in failing to require an offer of proof of first degree murder before "death qualifying" the jury.

Prior to trial, defendant moved to impanel the jury without reference to the death penalty on the ground that the lengthy process of death qualification was inappropriate in a case where the prosecution could not make an offer of proof which would show first degree murder. The lower court denied this motion on the ground that it had no authority to require such a showing, but noted the absence of evidence on the element of premeditation and deliberation.[1]

On August 1, 1979, death qualification of the jurors was begun in chambers; after the completion of the first of the two jury panels, the defense moved for a mistrial. The motion was denied and the defendant's subsequent petition for writ of mandate denied without opinion.

[1]The court, in denying the motion, declared that "the preliminary examination doesn't disclose evidence of first degree murder, and further, that I have not been advised of any evidence of premeditation and deliberation that will be presented to the jury."

At the conclusion of the prosecution's case, the trial court granted a defense motion for acquittal of first degree murder pursuant to Penal Code section 1118.1, but denied a defense motion for mistrial based on the prejudice caused by the death qualification. On August 20, defendant was convicted of second degree murder on count I with a finding that he used a deadly weapon, a knife, but acquitted of count II (assault with a deadly weapon). His motion for a new trial was denied and he was sentenced to state prison for a term of 19 years to life.

The pertinent facts as revealed by the record are as follows: Eva and John LeBeau were married in January 1970, separated in April 1976, but never filed for dissolution. In September 1978, Eva met defendant in a bar and by December of that year was living with him at 491 Arletta in San Jose, together with Jackie, Eva's daughter by John LeBeau.

On February 12, 1979, the victim, LeBeau, called Eva and asked her if she would agree to a divorce. He indicated that he was willing to file the action, pay the fees, and provide $100 a month in child support. He also asked if he could come to 491 Arletta that night to give Jackie a check for her birthday. Eva agreed after some hesitation. When Eva told defendant about this conversation, defendant indicated that he did not want to be there with LeBeau, but that he would be home later. Defendant came home between 6:30 and 7 p.m. and left again before LeBeau arrived about 7:30.

LeBeau and Eva bought a six-pack of beer and returned to the apartment. They discussed their marriage and LeBeau gave his daughter her gift. Defendant returned about 9:30 while LeBeau was still at the apartment. The two men went out and bought two more six-packs of beer and drank them. A defense expert testified as to the approximate blood alcohol levels of the three adults at 12:30 a.m.: .22 for LeBeau; .14 for Eva; and .09 for defendant, but was unable to say how any given individual would behave at a particular blood level.

After that time, defendant's and Eva's version of the facts diverge. Both testified at trial, and Eva gave a series of differing versions of the events, both before and after the trial.

Defendant testified that he and LeBeau were friendly when he returned. LeBeau was drinking heavily and began to pressure defendant to marry Eva. LeBeau then made a vulgar comment about having

Eva any time that he wanted and ordered defendant to leave. Defendant refused, saying "If anybody leaves the house it's going to be you, punk." Defendant and LeBeau began to argue, with LeBeau yelling about defendant marrying Eva and child support. After defendant said that he was not going to marry Eva because he "wasn't a sucker," LeBeau grabbed a knife from the kitchen table and said he was going to kill defendant for that comment. Defendant testified that he did not take his knife out until LeBeau shoved him and Eva got between the two men.

Defendant testified that he was afraid and, therefore, he began to stab LeBeau because the latter would neither drop the knife nor leave the house. They struggled in the living room and then towards the kitchen. Defendant held LeBeau's right arm but kept stabbing because LeBeau would not drop his knife. Defendant finally backed up and ran to look for Eva who had fled with Jackie. He ran outside and lost his knife somewhere. Defendant denied seeing LeBeau's body when he ran outside. Defendant walked up to the police when he saw them while returning to the house.

Eva's version of the above events differed significantly from that of defendant. In her initial account during two interviews at Kaiser Hospital[2] with Sergeant Leo Trombley of the Santa Clara Sheriff's Department on February 13 and 14, she stated that LeBeau made a comment during the evening that if defendant mistreated Eva, he would answer to LeBeau. Defendant then went to the bathroom and returned with a "switchblade"; defendant also took a steak knife from a kitchen drawer and threw it at LeBeau's feet saying "Use this, you son of a bitch." LeBeau did not pick up the knife but said, "John, don't do that. If you want me to leave, I'll leave." LeBeau backed out of the house and Eva heard him say "John, don't do that, John. Oh, my God." Eva did not mention any other argument or altercation between the two men. Her preliminary hearing testimony in March 1979 was essentially the same as her two statements immediately after the event.

In April 1979, after the preliminary hearing, Eva was interviewed again by Trombley. She mentioned the argument for the first time and indicated a disagreement over defendant's unwillingness to marry her

---

[2]Eva also was stabbed during the altercation, while everyone was still inside, but did not realize that she had been injured until later when she was bleeding outside the house.

and the child support payments, as well as LeBeau's vulgar comments. Eva stated that after LeBeau shoved defendant "or something," defendant took out his knife and somehow got the other knife and threw it at LeBeau's feet. She did not see LeBeau pick it up. She also did not see the stabbing but heard LeBeau say "John, don't. Oh, my God." She fled with Jackie and yelled for help.

At trial, Eva's testimony included the argument over the marriage and child support. She described LeBeau's sexual innuendos and stated that he was the only one who had raised his voice. After LeBeau shoved him, defendant pulled his knife out of his pocket. LeBeau agreed to leave. Eva saw LeBeau backing out of the door with defendant following him and heard LeBeau say "Don't do that, John." Eva then heard someone say "Oh, my God."

At trial, Eva claimed that because she was angry with defendant, she had lied in her initial interview about defendant getting another knife and throwing it at LeBeau's feet. She indicated that LeBeau had something in his hand as he was backing out of the door, but she could not see what it was; it might have been the steak knife that was on the table. She still loved defendant, talked to him every night in jail, and had taken her daughter to visit him. Eva denied that defendant had asked her to change her story. Trombley testified that Eva exhibited no hostility towards defendant during the initial February interviews at the hospital.

The next door neighbors, Jeanette and Nicholas Pennucci also testified. Mrs. Pennucci was awakened by the sound of people fighting and heard someone yell "Stop it Joe. For God's sake, it's enough." Mr. Pennucci testified that his wife woke him up as she heard people fighting. When he looked into the driveway of 491 Arletta, he saw a body and also saw a man run out of the apartment past the body and run down the street. Mr. Pennucci heard Eva's calls for help and called the police.

Another neighbor, Mrs. Betty Monk, testified that she was in her kitchen when she heard loud voices and an argument. She looked out her window and saw the shadows of two people, then of a third, come out of defendant's house; someone said "Oh, John" or "No, John" and the two men moved towards the carport. The taller one was being punched or struck at by the shorter one and seemed wobbly. The taller man did not throw any punches or offer any resistance. The taller man

slid down the fence and then picked himself up. When he stood up, the attack resumed, although he had offered no resistance. When the taller man fell, the shorter one ran away. She saw a body lying on the ground in a great deal of blood.

The authorities arrived at approximately 12:40 a.m. Deputy Frank Roman saw the victim lying on his right side in a large pool of blood, bleeding profusely. He was unconscious but groaning. There was nothing in his hands; no weapons were found in his vicinity. Just outside the front door was a knife with a bent blade. A small amount of blood was on the blade. There was some blood on the gate outside and a considerable amount inside the front door and on the front door.

Deputy Roy Froom was the first police officer to meet defendant when he approached them after the killing. Defendant appeared excited and confused and kept "rambling the same statements again and again." Froom testified that defendant made several spontaneous statements, pointing to the area where LeBeau had been found, and reiterated that it was *his* (i.e., defendant's) house. Defendant claimed that he had come home to find a man in his house and that after they argued about child support payments for the man's daughter, there was a physical fight. Deputy John Hayes testified that defendant said "He raised hell in my house. I don't have to put up with that shit." Defendant appeared nervous and tense but rational and reasonably in control.

LeBeau was taken to the hospital in an ambulance and pronounced dead at 3:16 a.m. Dr. Richard Mason, who performed the autopsy, identified 45 separate stab wounds on the body. Some, on the arms and hands were defensive caused by his attempts to shield himself from the attacker.

■ Defendant first contends that the evidence is insufficient to support the judgment and verdict finding him guilty of second degree murder, as there is sufficient evidence of provocation and therefore no basis for the finding of implied malice. There is no merit to this contention.

■ Under the applicable federal and state standards, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence that is reasonable, credible and of solid value, so that a reasonable trier of fact could find defendant guilty beyond a reasonable doubt (*People* v. *Johnson* (1980) 26 Cal.3d

557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People* v. *Lassell* (1980) 108 Cal.App.3d 720, 731 [166 Cal.Rptr. 678]; *People* v. *Colver* (1980) 107 Cal.App.3d 277, 288 [165 Cal.Rptr. 614]).

■ Penal Code sections 187 and 188 define murder as the unlawful killing of a human being with malice aforethought; the necessary malice is implied when no considerable provocation appears. An assault with a deadly weapon made in a manner to endanger life and resulting in death is sufficient to sustain a conviction of second degree murder, as the requisite malice is implied from the assault (*People* v. *Lines* (1975) 13 Cal.3d 500, 505-507 [119 Cal.Rptr. 225, 531 P.2d 793]; *People* v. *Lewis* (1969) 1 Cal.App.3d 698, 701 [81 Cal.Rptr. 900]; *People* v. *Brunk* (1968) 258 Cal.App.2d 453, 457 [65 Cal.Rptr. 727]).

Defendant, however, urges that here, the evidence suggests that the crime occurred under circumstances of substantial provocation (*People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 414 [303 P.2d 1018]; *People* v. *Brunk, supra*, p. 457). ■ "'To reduce a felonious homicide from the grade of murder to manslaughter upon the ground of sudden quarrel or heat of passion, *the provocation must be of such character as would be naturally calculated to excite and arouse the passion....* Heat of passion is defined as such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and consequently no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'" (*People* v. *Valentine* (1946) 28 Cal.2d 121, at p. 137 [169 P.2d 1]; *People* v. *Brunk, supra*, 258 Cal.App.2d 453, 457; *People* v. *Bridgehouse, supra*, 47 Cal.2d 406, 413; *People* v. *Washington* (1976) 58 Cal.App.3d 620, 625-626 [130 Cal.Rptr. 96].) It is the exclusive province of the trier of fact to determine whether or not the particular facts and circumstances are sufficient to create a reasonable doubt as to whether defendant committed his offense under a heat of passion.

■ At trial, the crucial factual dispute focused on the sufficiency of the evidence to support a finding of implied malice. Defendant attempts to support his claim of substantial provocation by relying on his version of the events and Eva's more favorable version. However, both defendant's version of the facts and Eva's favorable one were

impliedly rejected by the jury in resolving the conflicts and inconsistencies in the testimony. (*People* v. *Ozene* (1972) 27 Cal.App.3d 905, 910 [104 Cal.Rptr. 170].) As we indicated above, Eva's initial story to the police did not mention any argument between defendant and LeBeau. To the contrary, she stated that defendant threw a knife at LeBeau's feet *after* LeBeau made a comment that defendant would answer to him if he mistreated Eva. As the victim was leaving, Eva heard him say "John, don't do that," and "Oh, my God."

Eva's initial version finds support in the uncontroverted testimony of the neighbors: Mrs. Pennucci, who heard someone say "Stop it, Joe. For God's sake, it's enough," and Mrs. Monk who heard the substantially similar "Oh, John" or "No, John." Mrs. Monk also witnessed the attack outside the house on a man who was wobbly and offering no resistance. The neighbors' testimony (which we must assume the jury believed), fails to establish heat of passion and undercuts defendant's argument that he did not want to kill LeBeau but merely to get him out of the house. Furthermore, defendant's explanation is not consistent with the existence of 45 separate stab wounds on LeBeau's body. Defendant complained only of a small lump on his hand obtained in the struggle over the knife.

As indicated above, the major support for defendant's claim of provocation comes from his own testimony and Eva's second (and presumably altered) version of the events. Although other witnesses related incidents in which LeBeau had become violent while drinking, he did not carry a knife or other weapon. The jury was justified in discrediting Eva's change in testimony in light of her repeated talks with defendant in jail and visits with him. Although she claimed that she omitted the argument from her initial statements as indicated above, the officer did not observe any hostility on her part towards defendant at that time. Eva also admitted that she still loved defendant and that he had asked her if she realized what she had done with her statement about the kitchen knife.

The record supports the jury's implied rejection of other portions of defendant's testimony. Although defendant denied seeing the body in front of the house, both Mr. Pennucci and Mrs. Monk saw him run past it. While defendant claimed that LeBeau grabbed the knife from the kitchen table, Eva testified earlier that the knife would never be left on the table and had not been left out earlier in the evening. Defendant's story of a second knife also finds no support in the record in view of

Eva's conflicting statements about the knives. In their investigation, the police uncovered a single knife, the steak knife.

Defendant relies on *People v. Bridgehouse, supra,* 47 Cal.2d 406, to urge that the simple and unexpected encounter of his wife's lover in his home was adequate provocation as a matter of law. However, as recently explained in *People v. Foster* (1980) 102 Cal.App.3d 882 [162 Cal.Rptr. 623], the defendant in *Bridgehouse* did more than merely have contact with a passive victim; he had no recollection of the shooting and was white and shaking *before* the killing; he had been under a great strain due to his wife's extended affair with the victim. Thus, Bridgehouse's encounter in his mother-in-law's house was a great shock to him. In *Foster,* as here, the defendant was aware of what had happened and took steps toward the killing. Here, also, the defendant was "excited and confused" after the killing but still able to give the officers a rational statement as to what had taken place.

A crucial factor is the pre-existing stress on the defendant. In *People v. Aguilar* (1973) 32 Cal.App.3d 478, 480-482 [108 Cal.Rptr. 179], the court affirmed a second degree conviction, despite evidence that the defendant knew his wife was having an affair with the victim and that the "atmosphere was charged" when they met. In *Aguilar, supra,* the victim claimed to have just "laid" the defendant's wife and further threatened "to get" his daughter. In the instant case, defendant and the victim had begun their encounter peacefully and shopped for beer. There is no evidence that defendant was under any particular stress.

Defendant correctly cites *People v. Hoover* (1930) 107 Cal.App. 635, 639 [290 P. 493], for the rule that the identity of the aggressor or initiator of the altercation is relevant in evaluating the evidence of provocation. *Hoover,* however, does not aid defendant because of the jury's implicit rejection of defendant's claim that LeBeau initiated both the argument and the physical attack.

We conclude that in light of the entire record, the jury reasonably could have found beyond a doubt that there was not sufficient evidence of provocation. As to his intent, the jury also could have reasonably found that defendant possessed the requisite implied malice from his assault with a deadly weapon which resulted in 45 stab wounds to LeBeau, and some to Eva. Defendant incurred no wounds at all.

■ Next, defendant argues that his conviction must be reversed because the death qualification of the jury deprived him of his federal Sixth Amendment right to be tried by a representative cross-section of the community, and also that such a jury is not an impartial one. During the pendency of this appeal, both the defendant and the People requested this court to take judicial notice of *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], and to defer our determination of this appeal pending the Supreme Court's decision in *Hovey* on the constitutionality of the process of death qualification. We did so.

In *Hovey, supra,* our Supreme Court set forth three possible analyses in challenges to the death qualification process, each with a different burden of proof. First is that of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], where the defendant alleges a Sixth Amendment deprivation of due process. There, the burden is on the defendant to establish a "substantial doubt" that a death qualified jury is not constitutionally neutral with respect to guilt (*Hovey, supra,* fn. 41, p. 19).

The second analysis, the "pure" cross-section approach of *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 526, 537 [42 L.Ed.2d 690, 695-696, 702, 95 S.Ct. 692], and *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664], requires that the jury be selected from a panel representative of the community. Once the defendant has established that the persons excluded comprise a constitutionally cognizable group, the state must demonstrate the constitutionality of the exclusion (*Hovey, supra,* pp. 13-14).

Pursuant to the third approach of *Ballew* v. *Georgia* (1978) 435 U.S. 223 [55 L.Ed.2d 234, 98 S.Ct. 1029], and *Burch* v. *Louisiana* (1979) 441 U.S. 130 [60 L.Ed.2d 96, 99 S.Ct. 1623], the court determines if a particular procedure has had any significant impact on the purpose and function of a jury in a criminal trial to represent both minority viewpoints and groups. If the defendant can demonstrate a "substantial doubt" that this purpose is being achieved through empirical or other evidence, the court must then inquire whether there is any counterbalancing state interest sufficient to sustain the procedure (*Hovey, supra,* pp. 13-16).

On this appeal, understandably defendant has not articulated clearly which of the above three constitutional approaches he urges. First,

defendant points to his Sixth Amendment right to be tried by a cross-section of the community and cites *Taylor* v. *Louisiana, supra,* 419 U.S. 522, and *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. From this contention, we imply a "pure" cross-section analysis. Such an analysis would make *Hovey, supra,* inapplicable. The defendant in *Hovey* specifically declined to make that argument, and our Supreme Court noted that its decision did not reach the validity of any argument based on a pure cross-section analysis (*Hovey, supra,* fn. 18, p. 38).

Here, defendant further complains of the excusal of those jurors who held "particular beliefs" about the death penalty and points to those who said they would never vote for the death penalty and those who said that they automatically would vote for it. This approach also finds no support in *Hovey* as there the defendant did not challenge either the exclusion of the first group from the penalty phase of a capital case or the barring of the second group from the guilt phase (*Hovey, supra*).

Defendant next argues that a prospective juror's beliefs in the death penalty should *not* have been the cause for exclusion from the guilt phase of his trial. Defendant questions, as did the defense in *Hovey,* whether a prospective juror who can be fair and impartial in determining the guilt or innocence of an individual accused of a capital offense *may be removed for cause* from serving at the *guilt* phase because the juror is unequivocally opposed to the imposition of the death penalty at the *penalty* phase.

As to the third approach of *Ballew-Burch, supra,* defendant relies on language from *People* v. *Wheeler, supra,* 22 Cal.3d 258, 276, pertaining to the importance to the defense of the interaction of persons with diverse beliefs. He argues that it was not established that any counter-balancing state interest was furthered by the death qualification procedure here.

Defendant relies entirely on our acceding to the request for judicial notice of the opinion and record in *Hovey,* and more particularly that portion developed at an extensive evidentiary hearing in a separate proceeding (People v. Kenneth Lynn Moore and Davis Lee Moore, Super. Ct. Alameda Co., No. 67113). This portion of the *Hovey, supra,* record consisted primarily of sociological studies, graphs, charts, video tapes, and expert testimony. As defendant has presented no new evidence, we are bound by the Supreme Court's determination that the requisite

showing of a substantial doubt that a California death qualified jury is not constitutionally neutral also has not been made here (*Hovey, supra*, pp. 63-69).

After recognizing the validity of the empirical studies focusing on the deficiencies of a pool of jurors qualified under the *Witherspoon, supra*, 391 U.S. 510, standard with regards to neutrality as to guilt and adequacy to effectuate the purposes and functions of a jury, our Supreme Court explained in *Hovey, supra*, at page 68, that such a pool differs from a "California death qualified" group. The pool of jurors eligible to serve in a capital trial in California consists of those eligible to serve in a noncapital case who: 1) *favor the* death *penalty* but would *not vote to impose it in every case*; 2) *neither favor nor oppose* the penalty; and 3) *oppose or have some doubts* about the penalty but would not vote against it in every case. In California those who automatically would vote for the penalty are excluded pursuant to Penal Code section 1074, subdivision 8, as construed by case law. (*People v. Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33]; *People v. Gilbert* (1965) 63 Cal.2d 690, 712 [47 Cal.Rptr. 909, 408 P.2d 365]). (Such a group, however, is *not excluded* in a *Witherspoon* qualified jury.) The court therefore concluded that the evidence presented in *Hovey* was incomplete because all that had been "shown was" that *if* a state *used all four "Witherspoon-qualified"* groups in a capital trial, the jury would not be *neutral*. But as indicated above, California is not such a state (*Hovey, supra*, p. 68), and thus defendant's *Ballew* and *Witherspoon* contentions are not applicable.

Defendant further asserts under a *Taylor* "pure" cross-section analysis, federal and state Constitutions require that a jury be selected from a panel representative of the community. However, the defendant also has failed to identify a constitutionally recognizable group as defined by *Duren v. Missouri, supra*, 493 U.S. 357, 364 [58 L.Ed.2d 579, 586-587]. Therefore, defendant bears the burden of demonstrating that the resulting jury was *not neutral* and that this *nonneutrality* operated to his detriment (*Hovey, supra*, fn. 45, p. 20). Again, defendant has failed to meet his burden. He relies on an empirical study by Dr. Craig Haney, The Biasing Effects of the Death Qualification Process, published in 1979. This study also was part of the additional evidentiary record developed by the subsequent proceedings in *Hovey*, described above at page 17. The results of the Haney study showed a tendency of the death qualification process to alter the perspective of jurors who had participated in the process (*Hovey, supra*, pp. 75-79). Our Supreme

Court, however, did not hold that the process prejudices the defendant's right as a matter of constitutional law. Rather the court held that, pursuant to its supervisory authority over California criminal procedure and in order to minimize the *potentially* prejudicial effects identified in the Haney study, future death qualification of jurors should take place individually and in chambers (*Hovey*, p. 80). The record here indicates that with appropriate foresight, the trial court conducted the process in chambers.

We decline here to base a constitutional holding on the single empirical Haney study on the effect of the death qualification process on the mind set of jurors. The question is still open and we merely hold that this court is without a sufficient evidentiary basis to conclude that the death qualification process used in the instant case violated defendant's right to be tried by a jury selected from a panel representative of the community. We conclude, therefore, that defendant was not deprived of his right to a representative cross-section or an impartial jury under either the federal or state Constitutions.

■ Finally, defendant urges that the trial court committed reversible error by denying his motion to require a preliminary offer of proof of first degree murder before death qualification of the jury panel. As indicated above, the court below recognized the lack of evidence on the issue of premeditation and deliberation, but denied the motion on the ground that it lacked authority to require such a showing. In light of our conclusion that defendant failed to establish that the death qualification process prejudices him, it is unnecessary for us to reach the question of whether such a showing is required before allowing death qualification. However, assuming, without conceding, that such a procedure was constitutionally required, and that the trial court erred, the error, under the facts of this case, was not prejudicial under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

In view of this conclusion we need not discuss in detail the remaining contention on this appeal. We merely note that, relying on Penal Code section 1252, the court in *People v. Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384], at page 701, upheld the right of the People to obtain review of an allegedly erroneous ruling below "*in order to secure an affirmance . . . .*" (Italics added.) The People have asked us to review the trial court's limitation on peremptory challenges. The record however indicates that initially the court merely indicated that a

peremptory challenge if based solely on a juror's doubts, uncertainty and reluctance about the death penalty *might* be a challenge based on group bias and thus potentially improper under *People* v. *Wheeler, supra,* 22 Cal.3d 258. When the prosecution sought clarification the court reiterated that: "... I am only prepared to say at this time that if either side exercises peremptory challenges solely because of a juror's conscientious scruples, that there very well may be a *Wheeler* case involved, and that is as much as I am prepared to say." Thereafter the prosecutor exercised eight peremptory challenges without objection from the defense or any interference by the court. Thus, in the light of the conclusion we have reached above, there is no record of any erroneous ruling that we need to review to secure an affirmance.

We conclude that there has not been a showing of an error of constitutional dimension such as would require reversal of the judgment and conviction. In light of the support given to the potential of prejudice to a defendant from the death qualification process by the Haney study, discussed *ante,* and in *Hovey, supra,* we are constrained to caution trial courts against engaging in the death qualification process when there is no chance that a matter will get to the death penalty phase. We also note that here, the evidence of guilt was overwhelming and that any possibility of prejudice was minimized by the fact that the death qualification process occurred in chambers, the very procedure subsequently mandated for the courts of this state by *Hovey, supra,* at page 80.

The judgment is affirmed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied April 8, 1981, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 1, 1981.