Filed 12/13/24  P. v. Hamilton CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ARTHUR LUMONT HAMILTON,<br><br>　　Defendant and Appellant. | B331887<br><br>(Los Angeles County Super. Ct. No. BA487545) |

　　APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Garcia, Judge.  Affirmed.

　　Cheryl Lutz and Judith Kahn, under appointments by the Court of Appeal, for Defendant and Appellant.

　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Lauren N. Guber, Deputy Attorneys General, for Plaintiff and Respondent.

　　　　　　　　———————————————

A jury convicted Arthur Lumont Hamilton of the second degree murder of Sarah Jackson. On appeal, Hamilton contends there was insufficient evidence of malice. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I. *The Information*

The information charged Hamilton with Jackson's murder (Pen. Code, § 187, subd. (a)).[1] It also alleged Hamilton personally used a deadly and dangerous weapon, to wit, a knife. (§ 12022, subd. (b)(1).)

## II. *The Trial*

### A. *Evidence in support of the People's case*

The trial took place in February and March 2023. Hamilton and Jackson, who was Hamilton's girlfriend, were homeless and living in Hamilton's car in Los Angeles. According to Jackson's friend Mary Black, who lived nearby on the same side of the street as Hamilton, Hamilton and Jackson argued almost every day. As explained by Black, sometimes the arguments escalated and became physical, with Hamilton typically acting as the aggressor. Black once saw Hamilton carrying a tire jack as he approached Jackson. Due to the nature of Jackson and Hamilton's relationship, Black told Hamilton, "You are not going to hit her with that."

On May 20, 2020, Hamilton and Jackson had been arguing. That night, Jackson spoke to her friend William Sutton, who lived on the other side of the street. Sutton had been near the street corner at the time, and Jackson stopped to speak to him. She told Sutton she and Hamilton were having a disagreement

---

[1] All undesignated statutory references are to the Penal Code unless otherwise indicated.

and asked Sutton to "look out" or "listen out" for her.

Five to ten minutes later, Sutton heard Jackson scream his name. Sutton went to Jackson and saw her lying in the street. He also saw Hamilton proceeding down the street away from Jackson. Sutton asked Hamilton, "[W]hat the fuck was going on" and, "[W]hat you do that for," but, rather than answering Sutton or returning to Jackson, Hamilton "just took off." Jackson was breathing, but when Sutton asked if she was okay, Jackson was unresponsive.

On May 20, 2020, Black was home at night when she heard someone calling her name. Black went to her front door and saw Sutton standing in the street and yelling her name. When Black stepped down from her porch, she observed Jackson lying in the street. Black also saw Hamilton riding his bicycle away from Jackson. Paramedics arrived minutes later. Sutton saw them try unsuccessfully to revive Jackson, who died at the scene.

Detective John Meneses arrived when Jackson's body was still lying in the street, close to Hamilton's car. Detective Meneses observed blood spatter, blood drops, and a beer can at the scene. The police impounded Hamilton's car that same night. A search of the car revealed blood on the inside and outside of the driver's side door, including on and near the exterior door handle.

The next day, Detective Meneses recovered a surveillance video (Exhibit 12) that captured parts of the May 20, 2020 incident. Another video (Exhibit 13) displayed a zoomed-in view of that same footage.[2] Both videos were played for the jury and admitted into evidence. An individual—whom Black identified as Hamilton—could be seen carrying a crate across the street,

---

[2]     Exhibits 12 and 13 were both silent videos.

placing the crate down on the sidewalk next to a vehicle identified as Hamilton's car, and walking back the way he came. Another shorter individual, identified during trial as Jackson, crossed the street to the crate and moved the crate closer to the wall. Hamilton returned with his bicycle. He faced the shorter individual on the sidewalk. The shorter individual moved into the street. Hamilton followed and made what Detective Meneses described as "striking motions." The footage later showed Hamilton walk back alone to the sidewalk, go near his bicycle, and walk to the driver's side of his vehicle. He then walked back to his bicycle. The video showed Hamilton on his bicycle holding a knife in his right hand.

An autopsy of Jackson revealed eight lacerations, comprising six stab wounds—in the cheek, chest, back, shoulder, arm, and abdomen—and two incised wounds on the hand. A deputy medical examiner testified that incised wounds are like slashes or cuts and are consistent with defensive wounds. The medical examiner opined that the manner of Jackson's death was homicide and the cause of death was multiple stab wounds, with the fatal wound being a stab wound that penetrated Jackson's chest and into her heart. The stab wound to Jackson's abdomen perforated her bowel, resulting in fecal matter leaking from the wound, and was also life-threatening.

Detective Brad Golden, who was part of the team collecting evidence on the night of the incident, took DNA swabs from blood found at the homicide scene, including from the blood-marked sidewalk and the blood-spattered back of a white vehicle parked near Hamilton's blue car. Detective Golden also took a swab from the bloodied exterior of the driver's side door of Hamilton's vehicle.

In November 2020, a law enforcement task force located Hamilton and arrested him. Reference samples for DNA analysis were taken from Hamilton and Jackson. A criminalist conducted DNA testing that revealed the swabs from the sidewalk and the back of the white vehicle contained Jackson's blood, not Hamilton's. As for the swab from the exterior door of Hamilton's car, it contained a mixture of 81 percent Jackson's DNA and 19 percent Hamilton's. Because that specific swab contained more than one contributor's DNA profile, a conclusion could not be reached whether each person's DNA profile for the swab was from blood or another source, such as "touch DNA" from the skin.

B. *Hamilton's testimony*

Hamilton testified in his own defense. He and Jackson had been dating for six months, but they had known each other before then. As their relationship progressed over time, it changed, and they were arguing over "anything, everything."

On the day of the incident, he ran into Jackson carrying a crate that had some of his things in it. He asked her why she was carrying his things and other questions, and she said, "Don't worry about it." He took the crate from her, carried it to his car, and set it down. He later discovered she had left his car unlocked, which was a problem for him. He had been living in his car for several months, and someone had previously broken into it. He had been parking it on that particular street because of the nearby security cameras, which he thought might deter others from breaking in while he was away from the car.

Hamilton identified himself as the person carrying the crate to his car, walking back to get his bicycle, and then returning with the bicycle in Exhibit 13, and Jackson as the other individual depicted in the video. When the video showed Jackson

5

sitting down and Hamilton standing, Hamilton testified he was arguing with her about leaving his vehicle unlocked, but she that was not in the mood to hear him.  While Jackson remained sitting on the sidewalk, Hamilton checked his vehicle to see if anything had been stolen.

At some point, Jackson stood up.  The video showed Hamilton taking something out of the crate.  He testified it was just his phone and that he had immediately thrown it back so that his hands were empty.  Jackson started to leave, and Hamilton told her, "Come back here.  I'm not through talking with you."  Jackson walked away from Hamilton.  Hamilton admitted the video showed him holding up his hand as she did so, but he denied he was holding anything.  He chased Jackson down and confronted her as she was running away from him.

According to Hamilton, when he confronted Jackson, she said, "Fuck you," called him a "son of a bitch," and pulled out a knife.  Hamilton asked her what she was doing and told her, "Come back."  When he saw the knife, he thought she was "bullshitting" him, and so he "walked up on her."  They started wrestling for the knife, and she cut the palm of his left hand.  He took the knife from her and then "blacked out" because she called him a "son of a bitch."  The video then showed increased movement that Detective Meneses had characterized as Hamilton making striking motions.  Hamilton admitted he "probably" had the knife at that point.  He also admitted that the video had not shown Jackson with a knife.

Hamilton testified that he then went to his car while still blacked out and locked it.  He got onto his bicycle and rode away while holding the knife in his right hand.  He had been drinking that night and also had a beer can as he rode off on his bike.  He

identified himself as the individual shown on video surveillance (Exhibit 8) riding a bicycle and holding a knife. He also admitted that Exhibit 13 showed him on his bicycle with a knife in his right hand, which he testified had come from Jackson.

Hamilton further testified that he was interviewed by detectives on the day he was arrested, which other evidence showed was in November 2020. He admitted telling them he had no idea what happened to Jackson and did not tell them or anyone else that Jackson had pulled a knife on him that night. He testified that he was addicted to drugs and alcohol and that, at the time of the interview, he could not remember what happened because he had blocked it out, was high, and had been drinking. He drank every day, did not recall anything, had been in a "blackout" for months, and only started remembering what happened after watching the video footage a year later. When confronted by the prosecutor at trial with a description of the video as depicting Hamilton "stabb[ing]" Jackson, rather than challenge the prosecutor's accusation, Hamilton responded that he "must have been blacked out."

Although Hamilton professed to have loved Jackson, he made no effort to follow up on her condition and only learned she had died when someone told him a month after her passing. He did not call the police, nor did he return to the scene or his car, claiming he was not concerned about the things in it. After the incident, he stayed at motels and other places within Los Angeles. He did not recall ever leaving town in the months between the incident and when he was arrested and did not recall telling the detectives that he went to Sacramento and San Diego.

### C. *The People's rebuttal evidence*

Detective Jason Sharman testified that he and his partner interviewed Hamilton in November 2020. The jury was shown a video of the interview, which was admitted into evidence. When confronted by the detectives during the interview with the accusation that he had stabbed Jackson, Hamilton claimed he "wouldn't do nothing like that. I don't even do none of that." Hamilton admitted he had lived in his car with Jackson and had a lot of belongings in it, but told the detectives he never tried to get his car out of impound and "just let [his belongings] go." He had gone to Sacramento after the incident "just to get away" and most recently had been staying in San Diego, "rid[ing] the bus" and going "everywhere."

Detective Sharman had also been called to the scene on the night of the homicide. When canvassing the area for evidence, he found blood drops on the curb close to Hamilton's vehicle consistent with the path Hamilton took to leave the scene. The prosecutor played the Exhibit 8 video clip in its entirety. It showed Hamilton having some difficulty with his bicycle, dropping something from his left hand and onto the sidewalk, and riding away with a knife in his right hand. Detective Sharman testified he had observed a beer can on the sidewalk in the exact location where the video showed Hamilton drop something. Upon close inspection of the beer can, Detective Sharman did not observe any blood on it.

## III. *The Jury's Verdict*

The jury convicted Hamilton of the second degree murder of Jackson. It also found true the allegation that he personally used a deadly and dangerous weapon, to wit, a knife. During sentencing, the trial court struck this allegation, as well as a

8

prior strike conviction, and sentenced Hamilton to 15 years to life in state prison.

## DISCUSSION

Hamilton contends his murder conviction should be reversed because there was insufficient evidence of implied or express malice.  We reject his contentions.

## I.    *Applicable Law and Standard of Review*

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "Manslaughter is the unlawful killing of a human being without malice."  (§ 192.)  Malice may be express or implied.  (§ 188, subd. (a).)  A defendant acts with express malice "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature."  (*Id*., subd. (a)(1).)  Malice is implied "when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' "  (*People v. Reyes* (2023) 14 Cal.5th 981, 988; accord, *People v. Mumin* (2023) 15 Cal.5th 176, 190 [implied malice is "when 'a defendant act[s] with conscious disregard of the danger to human life' "].)  " '[I]mplied malice may be proven by circumstantial evidence.' "  (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)

"In reviewing a challenge to the sufficiency of the evidence, we 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty

9

beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 423; accord, *People v. Middleton* (2023) 91 Cal.App.5th 749, 768.)  " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " '  [Citation.]  'A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility.'  [Citation.]  Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' "  (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378.)

## II.　*There Was Substantial Evidence of Implied Malice*

Substantial evidence supported Hamilton's second degree murder conviction under a theory that he acted with implied malice.  Jackson's cause of death was multiple stab wounds. There was ample evidence that, after chasing and confronting Jackson, Hamilton stabbed her multiple times with a knife, including surveillance video footage that showed him chasing and then making striking motions toward Jackson after she tried to get away from him.[3]  Jackson's multiple injuries included life-threatening wounds penetrating her chest through to her heart, as well as piercing her bowel.  Anyone would have been aware

---

[3]　Hamilton never denied either at trial or on appeal that "he struck [Jackson]."  Indeed, in closing argument, Hamilton's counsel informed the jury, "This is not a who done it."

10

that inflicting multiple stab wounds with a knife, including to the heart and bowel, would endanger the victim's life. The record discloses substantial evidence from which the jury could rationally find beyond a reasonable doubt that Hamilton acted with conscious disregard of Jackson's life in doing so. (See *People v. Pacheco* (1981) 116 Cal.App.3d 617, 627 [concluding the jury "could have reasonably found that defendant possessed the requisite implied malice" from his assault with a knife resulting in multiple wounds]; see also *People v. Murphy*, *supra*, 80 Cal.App.5th at p. 728 [" '[i]t takes no leap of logic for the [trier of fact] to conclude that because anyone would be aware of the risk, [defendant] was aware of the risk' "]; cf. *People v. Avila* (2009) 46 Cal.4th 680, 701–702 [concluding, where "defendant repeatedly attempted to stab Montoya, an unarmed and trapped victim, and succeeded in stabbing him in the arm and leg," "[t]his evidence alone is substantial evidence of defendant's intent to kill"].)

Moreover, after stabbing Jackson, rather than attempt to check her condition or assist her, Hamilton walked away from her as she was lying in the street, went to his car and locked it, and then fled the scene on his bicycle as Sutton arrived upon hearing Jackson scream his name. There was more than enough evidence of implied malice to support Hamilton's second degree murder conviction. (See, e.g., *People v. Leon* (2015) 61 Cal.4th 569, 607 ["flight is relevant to show consciousness of guilt"]; *People v. Palomar* (2020) 44 Cal.App.5th 969, 978 ["[b]y walking away without taking any measures to assist Rustigian, appellant manifested a callous indifference to human life"].)

Hamilton argues that the mental component of implied malice was absent because he was an addict and high on drugs

11

and alcohol when he stabbed Jackson. However, evidence of voluntary intoxication, including the voluntary ingestion of alcohol and drugs, cannot negate implied malice. (§ 29.4;[4] *People v. Soto* (2018) 4 Cal.5th 968, 975 ["section 29.4 prohibits the use of evidence of voluntary intoxication to establish that a defendant acted without implied malice"; distinguishing between express and implied malice for purposes of section 29.4]; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1300–1301 [voluntary intoxication is irrelevant to implied malice].)

Hamilton also contends there was no malice because he acted in imperfect self-defense. In support of that argument, he relies on his trial testimony that Jackson pulled out a knife and cut his hand. He also points to his testimony that he had seen Jackson in the past with a pocketknife and evidence that Jackson had been convicted in 2017 for assault with force likely to cause great bodily injury. We reject Hamilton's contention.

---

[4]     Section 29.4, subdivision (a), provides, "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." Subdivision (b) provides exceptions, including, "when charged with murder, whether the defendant premeditated, deliberated, or harbored *express* malice aforethought." (§ 29.4, subd. (b), italics added.) The statute defines voluntary intoxication to include "the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (*Id.*, subd. (c).)

"Under the doctrine of imperfect self-defense, . . . '[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . , not murder.'" (*People v. Schuller* (2023) 15 Cal.5th 237, 243.) "While 'closely resembl[ing] an affirmative defense' [citation], imperfect self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter . . . is not a defense but a crime . . . .' [Citation.] [¶] . . . [W]hen imperfect self-defense is at issue in a murder case, the People must prove the absence of that circumstance 'beyond a reasonable doubt . . . in order to establish the . . . element of malice.'" (*Id.* at p. 253.)

"The belief required to support imperfect self-defense is that the defendant 'was in imminent danger of death or great bodily injury.' [Citation.] This doctrine is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with.*" ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 97–98; see *People v. Steskal* (2021) 11 Cal.5th 332, 346 [evidence that defendant believed "he was in some danger at the time of the killing" did not constitute substantial evidence defendant "perceived [victim] as posing 'a risk of imminent peril' " necessary to support a theory of imperfect self-defense].) " 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. . . . " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Here, though the jury was instructed with CALCRIM No. 571, the instruction on imperfect self-defense, there was substantial evidence to support the jury's implied finding that Hamilton did not act in imperfect self-defense when he killed Jackson. The jury could have reasonably found Hamilton's testimony that Jackson had pulled out a knife not credible. By his own admission, the Exhibit 13 surveillance video—which showed him chasing Jackson as she ran away from him, confronting her, and making striking motions in her direction— did not depict Jackson holding a knife. Although Hamilton claimed that Jackson had cut him on the palm of his left hand, Detective Sharman had observed no blood on the beer can that the evidence revealed Hamilton held in his left hand after the stabbing. Though the jury received evidence of Jackson's 2017 conviction for assault with force likely to cause great bodily injury and heard testimony from Hamilton about having seen Jackson in the past with a pocketknife, Hamilton also testified that Jackson had never pulled a knife on him before.

The jury could have also reasonably found Hamilton's claim that Jackson pulled a knife on him not credible because he had never mentioned it before trial—including to the detectives during his November 2020 interview. Although Hamilton testified he was blacked out for months after the homicide— which he explained meant he did not remember what happened and "kept everything out of [his] head"—the jury could have also reasonably found Hamilton's professed lack of memory not credible, and instead inferred his consciousness of guilt from his leaving town for Sacramento after the incident without the car in which he stored many of his belongings. (See *People v. Leon*,

14

*supra*, 61 Cal.4th at p. 607.)[5]

Even under Hamilton's own version of the events, there was substantial evidence that he did not actually believe he had been in immediate danger of death or great bodily injury when he stabbed Jackson. Hamilton's own testimony established it was he who chased after Jackson when she tried to run away from him. He also claimed he did not take her seriously when she pulled out the knife. Instead, he thought she was "bullshitting" him so he wrestled with her for the knife, during which she allegedly cut him. However, he did not testify that he was afraid; rather, he took the knife from her and then blacked out. Combined with Sutton's testimony that Jackson had asked him to look out for her that night, there was ample evidence for the jury to conclude that Hamilton was not in actual fear of imminent danger of death or great bodily injury when he fatally stabbed Jackson eight times.

On appeal, Hamilton in essence asks us to reweigh the evidence and to substitute our assessment of witness credibility in place of the jury's, which we are not permitted to do. (See *People v. Thomas, supra*, 14 Cal.5th at pp. 377–378; *People v. Jones* (1990) 51 Cal.3d 294, 314 ["[I]t is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, [the reviewing court] must accord due deference to the

---

[5] The jury was also instructed on CALCRIM No. 372, which provided in pertinent part: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt."

15

trier of fact and not substitute [its] evaluation of a witness's credibility for that of the fact finder"].)

Finally, we need not address Hamilton's contention that there was insufficient evidence of express malice, as Hamilton does not point to—nor are we aware of—any affirmative indication in the record that the jury's verdict actually rested on express malice. Though the jury was instructed on both express and implied malice, the prosecutor made a point to distinguish them in closing argument, emphasizing, "This is an example of implied. Our case is a demonstration of implied malice." As discussed, there was substantial evidence of implied malice, which was a valid basis for the jury's second degree murder verdict. Thus, regardless of whether there was insufficient evidence of express malice, reversal is not required. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129 ["[i]f the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground"]; accord, *People v. Mumin, supra,* 15 Cal.5th at p. 207.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BERSHON, J.\*

We concur:

EDMON, P. J.

ADAMS, J.

---

\*    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17