Filed 12/5/23  P. v. Bejarano CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096419 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE014152) |
| v. | |
| BOB BEJARANO, | |
| Defendant and Appellant. | |

Defendant Bob Bejarano attacked inmate Eric Rodriguez in the prison yard.  The fight ended when a correctional officer shot Rodriguez, who went limp and fell onto defendant.  When officers reached them, defendant needed serious medical intervention and Rodriguez was dead.  After a jury trial, in which defendant represented himself, he was convicted of various offenses including assault with a deadly weapon by means of force likely to produce great bodily injury while undergoing a life sentence.  Defendant now appeals his convictions, arguing he was denied his right to a fair trial when the trial

1

court denied his discovery requests, limited his subpoena power, and denied him the ability to call defense witnesses. Finding no merit in defendant's claims, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Soon after a fight broke out in the prison yard, Officer Henry Kirkland, who was in a yard observation tower, ordered all inmates in the yard to get to the ground. All inmates complied, except for defendant and Rodriguez, who continued fighting. Although defendant started the fight by attacking Rodriguez with a metal weapon, Rodriguez wrestled the weapon away from defendant and became the aggressor. Rodriguez straddled defendant and repeatedly stabbed defendant's upper torso with the metal weapon. Defendant was on his back with his arms to the side of his head trying to protect himself; there was blood on the front of defendant's shirt. Fearing Rodriguez would kill or seriously harm defendant, Officer Kirkland fired one round from a Ruger Mini 14 at Rodriguez. The round struck Rodriguez's back and he subsequently died.

Nurse Gail Cox testified that, upon examination, Rodriguez had puncture, stab, or slice wounds to: his left cheek; both shoulder blades; under his sternum; near his kidney, lungs, and possibly spleen; left elbow; left wrist; upper chest; and right lower back. He had bruising and a puncture wound on his lower left back, which may have been a bullet wound. According to Cox, Rodriguez had a long, very deep, jagged wound over his carotid artery, which was a great contributor to his blood loss and trauma. He also had abrasions to his hands and on his back below his neck; he had a substantial bruise and discoloration on his lower left back, which could have been from lividity.

An inmate-manufactured weapon was discovered in the yard. It was flat metal, seven and one-half inches long, one-half inch wide, one-eighth inch thick, sharpened to a point at one end, and apparently had a cloth handle that had slipped off. The metal was bent, indicating that it had been used.

Defendant was conscious and initially taken to the prison hospital. He had puncture wounds to his middle chest, left flank rib, back left side, and left outer thigh.

2

Officer Robert Hart testified that he and Sergeant Steele accompanied defendant as he was transported by ambulance to UC Davis Medical Center (UCDMC) for treatment of his wounds.  According to Officer Hart, during a CT scan at UCDMC, medical staff observed two foreign bodies and asked defendant what they were; defendant replied that he had swallowed two bindles of heroin.  Officer Hart testified that he was present for that exchange as well as during defendant's surgery.  From defendant's stomach, medical personnel surgically removed two small bindles that were wrapped in plastic.  Officer Hart took possession of the bindles and later provided them to Officer Paul Bettencourt.

Officer Bettencourt, a member of the Investigative Services Unit (ISU), examined and tested the bindles.  The contents, which consisted of nine smaller bindles, weighed 1.14 grams and tested presumptively positive for heroin.  Officer Bettencourt characterized quantities of 0.05 grams and 0.11 grams, which two of the bindles weighed, as usable amounts.  Criminalist An Truong also tested the contents of all nine bindles and confirmed that they contained heroin.

Officers Alesandro Padilla and Martin Fong reviewed, and testified regarding, surveillance video of the fight in the yard.  The video reflected that as Rodriguez was playing basketball by himself, defendant sat at a nearby picnic table, donned gloves, removed an inmate-manufactured weapon from his shorts, and tossed a sheath under the table.  Defendant called Rodriguez over, then grabbed him by the shirt and began stabbing him towards the left side of his neck and head area.  Rodriguez tried to get away, successfully wrestled for the weapon, and began stabbing defendant with it.  Rodriguez then went limp and fell to the ground.

Defendant was charged with several offenses from this incident.[1]  The prosecution charged him with possession of heroin (Pen. Code, § 4573.6)[2] (count two); attempted murder (§§ 664/187, subd. (a)) (count three); assault with a deadly weapon (§ 4501, subd. (a)) (count four);[3] assault with a deadly weapon by means of force likely to produce great bodily injury while serving a life sentence (§ 4500) (count five); and possession of a sharp instrument (§ 4502, subd. (a)) (count six).  The prosecution also alleged that defendant had a prior conviction within the meaning of sections 667, subdivisions (a), (b)-(i), and 1170.12.[4]

Defendant represented himself at trial.  Although his initial request to discover a copy of the coroner's report to show that there was no lethal injury to the artery in Rodriguez's neck was denied, he subsequently obtained a copy of the report.  On defendant's motion, the trial court admitted the copy (Defense Exhibit No. EEE) into evidence.

A jury found defendant guilty of counts two, five, and six.  The jury also found true the prior conviction and the sentencing factor allegations.  The jury was unable to reach a verdict on count three, attempted murder.  A mistrial was declared as to count three, and it was ultimately dismissed in the interest of justice.

---

[1]  Defendant was also charged with possessing methamphetamine on a different date (Pen. Code, § 4573.6) (count one).  He was acquitted of this charge and the facts pertaining to that charge need only be recounted to the extent they are helpful to the resolution of issues raised.

[2]  Undesignated statutory references are to the Penal Code.

[3]  Count four was later dismissed as moot, as a lesser included offense of count five.

[4]  Aggravating circumstances were also alleged within the meaning of section 1170 and California Rules of Court, rule 4.421.

The court sentenced defendant to life without the possibility of parole for nine years, doubled to 18 years pursuant to section 667, subdivisions (b)-(i). On count two, the court imposed the upper term of four years. On count six, the court imposed the upper term of four years, stayed pursuant to section 654.

## DISCUSSION

### I

*Delayed Discovery of the Coroner's Report*

Defendant argues the trial court's refusal to order pretrial discovery of the coroner's autopsy report regarding Rodriguez's cause of death violated his right to a fair trial, due process, and to present a defense. (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, § 15.) We agree the basis for the trial court's ruling denying discovery of the autopsy report was incorrect but because defendant ultimately received a copy and was able to utilize the evidence in the way he desired, we find the error harmless.

*A. Additional Background*

Prior to trial, defendant sought to subpoena the coroner's report on Rodriguez's cause of death. At a subsequent hearing on a motion to compel this discovery,[5] defendant explained he wanted to show that Rodriguez did not die from wounds inflicted by defendant; he was killed by the officer. The trial court noted that defendant was not charged with Rodriguez's murder but was charged with "stabbing him in a way trying to kill him but not actually killing him." Defendant responded that part of his defense was that he did not attempt to kill Rodriguez. The trial court noted that even if Rodriguez had not died, defendant's charges would remain unchanged because "it's not actually him

---

[5] This subpoena duces tecum does not appear to have been served; defendant does not identify the proof of service associated with this subpoena. In the motion to compel discovery and at the hearing, defendant merely requested the document. It is unclear whether defendant sought to have the court order the subpoena to be served or to otherwise order the report to be produced.

dying that's relevant, it's the manner in which the assault was carried out that's relevant to the attempted murder charge." The court ultimately found that the cause of death was irrelevant and denied defendant's discovery request.

Gail Cox, a licensed vocational nurse with one year of training, testified that Rodriguez had a long, very deep, jagged wound over his carotid artery. Cox opined this injury "was a great contributor to blood loss and trauma." This wound was depicted in People's Exhibit No. 33, which was shown to the jury. Cox also testified that a cut to the carotid artery could be lethal if deep enough because it feeds the main blood supply to the brain.

At the conclusion of the prosecution's case, defendant sought to admit what he referred to as "the second part of the coroner's report," in which "it talks about the neck, the arteries in the neck. [¶] There was no . . . serious injuries to the arteries."[6] Defendant explained that he wanted the jury to understand the coroner's findings and that they were contrary to Cox's testimony. The prosecutor argued that it was hearsay and not relevant. The trial court admitted the report for impeachment purposes and stated that defendant could argue the locations of the injuries differed in the coroner's report. The prosecution produced what they represented was a complete coroner's report and had no objection to defendant's use of the document to impeach the nurse regarding the location of the wounds.

The coroner's report was subsequently introduced as Defense Exhibit No. EEE. The cause of death listed in the report was the gunshot wound to the torso. In the section of the report detailing "Sharp force injuries," with regard to injuries to the neck, the report describes "two stab wounds to the left side of the face. One . . . just anterior to the left ear . . . measures 1/2 inch in length . . . . It is superficial and extends into the

---

[6] The record does not disclose how or when he received the copy of the coroner's report.

6

underlying soft tissue. The second wound is . . . below the left earlobe . . .; it measures 0.3 inch. This extend[s] approximately1/2 inch into the underlying soft tissue, but does not injure any blood vessels." "There is a collection of stab wounds to the left clavicular region. The largest has a dried, abraded margin and measures 0.6 inch with a tail that extends inferiorly for 1 inch. Just adjacent to these is another superficial 0.3 inch stab wound. A small defect is seen on the anterior left lateral neck that measures 0.1 inch. This wound extends for approximately1/2 inch into the underlying soft tissue of the chest wall. It does not penetrate the pleural cavity."

In closing argument, the prosecutor relied heavily on Cox's assertion that Rodriguez suffered a wound to his carotid artery to argue defendant intended to kill Rodriguez in inflicting the wound. She used still shots of the video that captured the fight in the yard and urged the jury to conclude defendant "is going for where the carotid artery is. He's going for the kill shots." The prosecutor noted that although Rodriguez switched roles and became the aggressor in stabbing defendant, "there is red on [Rodriguez's] shirt because that is that carotid artery slice where he suffered the injury already. [¶] That is the one we heard Gail Cox talk about the fact that he was already going to probably die based on that." The prosecutor continued, "His intent was very clear. And you look at that video and you look at the injuries and it is all there that he intended to murder Inmate Rodriguez."

Defendant addressed this issue in closing argument by pointing to what he was "allowed to use" to explain what happened. He noted Defense Exhibit No. GG consisted of four pictures of Rodriguez's wounds, and that Defense Exhibit No. EEE was the coroner's report that provided Rodriguez's cause of death. Defendant argued that "another important fact that they argued was the neck. This will explain that injury to the neck. There was no serious injury to the neck. [¶] So even if you could have possibly or hypothetically stabbed a hundred times, that was not serious as she explains. [¶] . . . [¶] And if you guys look at the evidence, if you guys see that there was no intent to murder,

7

you know, because that injury, as they claim, it wasn't as serious. [¶] And this is the coroner's report if you guys are interested, but this is all I got left."

In rebuttal, the prosecutor argued: "So with regard to the coroner's report, the injury to the neck . . . — the Defendant is not charged with murder. . . . [I]t's irrelevant . . . what caused his death. [¶] The reality and the question is what was the Defendant's intent. . . . [¶] And I submit to you his intent is very clear by the video, by the witnesses that have testified, by his actions. He intended to kill Erik Rodriguez."

*B. Analysis*

Rulings on discovery motions are "addressed to the sound discretion of the trial court, which has inherent power to order discovery in the interests of justice." (*Hill v. Superior Court* (1974) 10 Cal.3d 812, 816.) "[T]he basis for granting pretrial discovery to a defendant is the fundamental principle that an accused is entitled to a fair trial [citations], and 'Absent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on the issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits.' [Citations.]" (*Ibid.*, italics omitted.)

We review a trial court's ruling on matters regarding discovery under an abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

The court's reasoning in initially denying discovery of the coroner's report hinged on the belief that the cause of Rodriguez's death was irrelevant because defendant was not charged with his murder. We believe this reflects too narrow a view of the issues in this case and the value of the autopsy findings. The prosecution charged defendant with attempted murder as well as assault with a deadly weapon while confined in a state prison under section 4500. For each offense, the prosecution was required to prove defendant acted with malice aforethought. (See *People v. Chandler* (2014) 60 Cal.4th 508, 517

[attempted murder requires a specific intent to unlawfully kill another human being with malice aforethought, citing §§ 187, 664]; *People v. Jeter* (2005) 125 Cal.App.4th 1212, 1216 ["Malice aforethought as used in section 4500 has the same meaning as it has for murder convictions, requiring either an intent to kill or 'knowledge of the danger to, and with conscious disregard for, human life' "].)

It is well-established that the manner in which a victim was wounded is relevant to the jury's determination of the offender's mental state. (See, e.g., *People v. Mills* (2010) 48 Cal.4th 158, 192 [the position of the body and the condition of the victim's clothes and whether injuries occurred before death might be relevant to the existence of consent]; *People v. Wright* (1990) 52 Cal.3d 367, 434 [photographs were "relevant to show the extent of the victim's injuries and the amount of force used in the commission of the murder"], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405; *People v. Gurule* (2002) 28 Cal.4th 557, 624 [a clean wound indicated "the killer had no hesitation"].) Although the degree of the resulting injury is not dispositive of a defendant's intent (*People v. Avila* (2009) 46 Cal.4th 680, 702), the jury may infer malice from the presence of multiple stab wounds (*People v. Pacheco* (1981) 116 Cal.App.3d 617, 627).

To that end, demonstrative evidence, such as photographs, may be admitted as evidence. (See *People v. Wader* (1993) 5 Cal.4th 610, 655 ["Generally, photographs that show the manner in which a victim was wounded are relevant to the determination of malice, aggravation and penalty"]; *People v. Heard* (2003) 31 Cal.4th 946, 974 [concluding photographs were relevant to establish the injuries suffered, the savageness of the attack, and the ferocious nature of the struggle].) It is also well-established that photographs may be relevant if they clarify the medical examiner's account of the placement of the wounds. (See *People v. Farnam* (2002) 28 Cal.4th 107, 185.) If pictures of wounds are relevant to understand the nature of the injuries inflicted on the victim and may serve to help explain the coroner's findings, it is axiomatic that a

coroner's report describing the nature of a victim's wounds is relevant in assisting the jury in determining whether defendant inflicted those wounds with malice aforethought. Indeed, the trial court recognized that "the manner in which the assault was carried out . . . [is] relevant to the attempted murder charge." Such evidence was similarly relevant to the assault charge, as it described the nature of the wounds inflicted on the victim. As argued at the hearing on the motion to compel pretrial discovery, the report was relevant to show Rodriguez's stab wounds were not as serious as the prosecution claimed. Thus, the trial court erred in failing to recognize such and in initially denying defendant's efforts to procure the report. However, midtrial the court apparently recognized some value in the coroner's report and admitted it into evidence.

At trial nurse Cox testified that Rodriguez had a significant neck wound over his carotid artery, which she opined "was certainly a great contributor to blood loss and trauma." A photograph of the wound was shown to the jury, and the prosecutor argued that even if Rodriguez had not been shot, he was likely to die from the carotid artery wound inflicted by defendant. The coroner's report seemingly conflicts with Cox's testimony as it mentions one superficial wound near the left ear and another wound below the left earlobe that did not injure any blood vessels. During trial, the court acknowledged that the report challenged nurse Cox's credibility and admitted the report as evidence for impeachment purposes.

As we have referenced above, the record discloses that prior to trial defendant had access to at least the part of the report pertaining to Rodriguez's neck wounds. Additionally, and contrary to defendant's argument, defendant was able to use the admitted exhibit to present his defense and argue that the information within the coroner's report negated evidence of his intent to kill Rodriguez.

Although the trial court admitted the coroner's report for impeachment purposes, the court did not provide a limiting instruction to the jury when the document was introduced into evidence. The parties then treated the exhibit as substantive evidence

10

rather than impeachment evidence. For example, while presenting his opening statement at the close of the prosecution's case, defendant told the jury, without objection, that his "exhibits will show the conflicting evidence" and "will show that I did not attempt to murder the victim." In closing argument, defendant argued the report's substantive importance when he told the jury that the coroner's report "will explain that injury to the neck" and that the injuries were not as serious as the prosecutor argued. The prosecutor's rebuttal argument also assumed the truth of the report; she argued that defendant was not charged with murder, so the cause of death was irrelevant. Finally, the court instructed the jury, without exception, on CALCRIM No. 222 that "evidence" includes "the exhibits admitted into evidence," which effectively signaled to the jury they could substantively consider the coroner's report.

In short, the record reflects the discovery of the coroner's report was delayed, not denied, and defendant was able to use the report as substantive evidence of his lack of intent to kill Rodriguez. Consequently, we conclude there is no reasonable probability that the error in initially denying discovery of the report affected the trial result, and thus the error was harmless. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 470 [applying harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) in determining prejudice as a result of delayed discovery].) Lastly, we note the jury did not reach a verdict on the attempted murder charge, which ultimately resulted in the dismissal of that count, further reflecting there is no reasonable probability that the error affected the trial result.

Additionally, although defendant did not argue that the nature of the wounds, as demonstrated in the coroner's report, indicated he had no malice aforethought for purposes of the assault with a deadly weapon charge, he was free to do so.

As a final matter, defendant claims that if he had the report prior to trial, he could have ascertained the pathologist's name and subpoenaed her as a witness. "In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court."

11

(*In re S.C.* (2006) 138 Cal.App.4th 396, 406.) "The party also must cite to the record showing exactly where the objection was made." (*Ibid.*) Here, defendant does not point to any part of the record demonstrating he sought to call the pathologist as a witness or that he needed the pathologist's name in order to do so. As previously noted, the subpoena only requested the coroner's report and, in discussing his need for the coroner's report, defendant never requested to include the pathologist as a witness. Defendant's proposed witness list does not include the pathologist, even by title. We thus deem the claim forfeited. (See *ibid*.)

We conclude the trial court's ruling denying defendant's motion to compel discovery of the report was based on the erroneous conclusion that the report was irrelevant. Nevertheless, because the report was later introduced at trial, and defendant was able to utilize the information contained within the report, the error was harmless.

## II

### *Pitchess Motion*

Defendant argues the trial court abused its discretion in denying his *Pitchess* motion[7] due to improper notice. He argues he had good cause for his noncompliance and requests this court remand the cause for an in camera hearing. We disagree.

#### A. *Additional Background*

In October 2021, defendant filed a *Pitchess* motion seeking the personnel records regarding several California Department of Corrections and Rehabilitation (CDCR) officers involved in his case. The motion was served on the superior court and "Office of the Attorney General[/]District Attorney" at the district attorney's address. At a hearing on December 10, 2021, the deputy district attorney advised defendant that he needed to serve the Office of the Attorney General.

---

**7** *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

From November 2021 through January 2022, the hearing on the motion was reset several times due to complications from the COVID-19 pandemic.

Defendant resubmitted the *Pitchess* motion on February 3, 2022. At a hearing on February 23, 2022, defendant's investigator was present and reported that he served defendant's *Pitchess* motion on the Attorney General's office the day before. The hearing was continued to March 23.

On March 14, a deputy attorney general responded to the motion via letter that the Attorney General had received two notices of motion and two *Pitchess* motions dated February 3, 2022, that noticed hearings for that same day. The letter informed defendant that the office was not authorized to accept service for CDCR and would not appear until CDCR and the warden were served.

At the hearing on March 23, the prosecutor acknowledged that defendant needed time to serve CDCR, rather than the Attorney General as she previous indicated, and requested a continuance so that defendant would have sufficient time to properly serve CDCR. The court continued the motion to April 11, 2022.

On April 4, 2022, the Attorney General served an opposition to defendant's *Pitchess* motion. The caption of the opposition stated the correct date for hearing the motion, April 11, 2022. The opposition acknowledged that defendant had served the motion by mail on California State Prison-Sacramento on March 18, but claimed the notice was defective in that the motion listed a hearing date of February 3, 2022. Alternatively, the opposition addressed defendant's motion on the merits.

Defendant's *Pitchess* motion was heard on April 11, 2022. The deputy attorney general acknowledged that CDCR had been served, but argued the court should decline to consider the motion as noncompliant when it listed February 3, 2022, as the hearing date. Nevertheless, the deputy attorney general was prepared to proceed if the court found good cause for lack of proper notice; two records custodians were present. In response, defendant pointed out that "according to the local court rules," 10 days' notice was

13

required, and the motion was served March 18, which was 10 days prior to the current date. When asked if they were prejudiced by the improper notice, the deputy attorney general responded, "Well, the short time that we had to respond and whatnot. But I believe he has to show good cause for his improper notice, as I understand it." When the trial court asked defendant for good cause, he admitted the hearing date was incorrect and asked to stipulate to correction of the date on the notice. The deputy attorney general responded, "We won't waive that or stipulate to it. If the Court finds good cause, that's one thing, but we can't waive it." "I mean, this notice is just for a past date. I mean, other than one of the attorneys in our office looking at the docket, we would never have even known." The court denied the *Pitchess* motion for improper notice: "[N]o good cause shown for the mistake or for not properly noticing the motion, and the Court will not consider the motion at this point without prejudice."

### B. *Analysis*

Confidential peace officer personnel records are discoverable upon a written motion establishing good cause. (§§ 832.5, 832.7; Evid. Code, § 1043, subds. (a) & (b); see *People v. Mooc* (2001) 26 Cal.4th 1216, 1226.) Notice of the motion to the officer's custodian of records must be "served and filed at least 10 days before the hearing. . . . Proof of service of the notice shall be filed no later than five court days before the hearing." (Evid. Code, § 1043, subd. (a)(2).) The motion shall include identification of the proceeding in which discovery is sought, the party seeking discovery, the peace or custodial officer whose records are sought, the governmental agency that has custody and control of the records, and the time and place at which the motion for discovery shall be heard. (Evid. Code, § 1043, subd. (b)(1).) "No hearing upon a motion for discovery or disclosure shall be held without full compliance with the notice provisions of this section except upon a showing by the moving party of good cause for noncompliance, or upon a waiver of the hearing by the governmental agency identified as having the records." (Evid. Code, § 1043, subd. (d).)

14

We review the denial of a *Pitchess* motion for an abuse of discretion, i.e., by determining if the denial exceeded the bounds of reason under all of the circumstances or was arbitrary or capricious.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.)

Here, defendant mailed his *Pitchess* motion to CDCR, the custodian of records, on March 18, 2022, but noticed a hearing date of February 3, 2022.  Under Evidence Code section 1043, subdivision (b), defendant was required to provide the time and place at which the motion would be heard.  Defendant was on notice since March 23, at the latest, that he was noncompliant with the notice requirements when a deputy attorney general sent defendant a letter stating the *Pitchess* motion contained incorrect hearing dates and should be served on CDCR.  On March 23, the court continued the hearing to April 11 and defendant had another chance to comply with the provision's requirements.  Indeed, the very reason for the continuance was so that defendant could properly serve CDCR.  Yet there is no indication defendant provided new notice of the hearing.  Nor does it appear that defendant ever filed a proof of service, much less complied with the requirement to do so five days before the hearing.

Defendant argues that we should consider his compliance as "substantial" enough to excuse his technical noncompliance.  Assuming, arguendo, that substantial compliance is sufficient in the *Pitchess* context, we find there was no substantial compliance when defendant failed to provide notice of the day and the time of the hearing.  (See *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [" 'substantial compliance' " means actual compliance in respect to the substance essential to every reasonable objective of the statute].)  Evidence Code sections 1043 and 1045 through 1047 establish procedures that ensure personnel records, which are generally confidential, may not be disclosed through the normal discovery process.  (See *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 710.)  The statutes recognize that both the officer and agency in question have a strong privacy interest in the personnel records and that such records should not be disclosed unnecessarily.  (*Id*. at p. 711; *City of Hemet v. Superior*

15

*Court* (1995) 37 Cal.App.4th 1411, 1430.)  The importance of compliance with the notice requirements is clear from the plain language of Evidence Code section 1043 when it fashioned a consequence for noncompliance.  Evidence Code section 1043, subdivision (d) clearly states that, absent good cause for noncompliance, no hearing shall be held without full compliance with the notice provisions.

Defendant argues that he had good cause for his noncompliance because he had to proceed through the pro. per. coordinator, quarantines related to COVID-19 delayed his efforts, and the prosecutor advised him his request would still be timely.  Yet, when the trial court specifically asked defendant to explain his good cause for noncompliance, he provided no such reasons.  Rather, he simply acknowledged he was noncompliant and asked the deputy attorney general to agree to correct the date.  Because defendant did not provide the trial court with good cause for his noncompliance, we find no error in the trial court's ruling.  We also need not consider his reasons for noncompliance, raised for the first time on appeal.  (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054 ["a party must raise an issue in the trial court if they would like appellate review"].)

Nor are we persuaded by defendant's assertion that the deputy attorney general waived any defect to notice when he appeared on the *Pitchess* motion.  In support of this argument, defendant cites to two cases, neither of which involves the *Pitchess* procedures as explained in Evidence Code section 1043 et seq.  (See *Carlton v. Quint* (2000) 77 Cal.App.4th 690, 697; *Tate v. Superior Court* (1975) 45 Cal.App.3d 925, 930.) "Wavier" appears in the statutory scheme regarding *Pitchess* motions to indicate that the custodian of records may waive a hearing on whether good cause for noncompliance has been shown (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 644), but there is no indication that waiver takes place automatically when the custodian or its representative appears on a defectively noticed motion *and* objects to that noncompliance.  When he appeared, the deputy attorney general specifically refused to waive the lack of proper notice or agree to any correction of the defect but was, just in

16

case, prepared to go forward if the court found good cause for defendant's noncompliance. We will not penalize the deputy attorney general by nullifying his client's right to object to defendant's noncompliance because he happened to discover the hearing date and prepare for it.

Defendant also argues that his noncompliance did not prejudice CDCR and the Attorney General, as the parties were ready to proceed on the merits of the motion if the court found good cause for defendant's failure to comply with the notice requirements. Maybe, but mere lack of prejudice does not mean a trial court abuses its discretion when it denies a motion that fails to comply with statutory requirements. The court acted within its discretion in denying the motion for defendant's noncompliance with the statute.

## III

### *Denial of Witnesses*

Defendant argues he was denied his right to present a defense when the trial court refused to allow him to call any witnesses. Defendant's argument addresses two groups of evidence: witnesses who could have testified that he was incapable of admitting he swallowed the bindles of heroin and witnesses who would have provided evidence that ISU had a pattern and practice of falsifying evidence, including Officer Fong. We agree the trial court erred in denying defendant's request to present medical witnesses without first holding a foundational hearing pursuant to Evidence Code section 402. Nevertheless, we conclude any error was harmless.

*A. Additional Background*

At several points during the trial, the parties discussed defendant's proposed witness list. These discussions revealed defendant's desire to address the following evidence.

17

### 1. Medical Personnel

Prior to trial, the prosecutor noted that many of the names on defendant's list matched those on the People's witness list and requested an offer of proof on the proposed witnesses listed as doctors from UCDMC. Defendant explained he wanted them to testify that he was incapable of consenting to the surgical procedure and would therefore have been incapable of uttering any admission, which would have impeached Officer Hart's testimony that defendant admitted swallowing two bindles of heroin. Defendant argued that five doctors listed on his witness list, Drs. Phan, DeSoucy, Louie, Guenther and Al-Jubari, were in the operating room at the time defendant allegedly made the incriminating statement and could testify that he made no such admission. The trial court agreed witnesses who could provide impeachment evidence could be subpoenaed. The court instructed the pro. per. coordinator to subpoena every witness on defendant's list.

During trial, defendant also requested subpoenas for the emergency medical technicians (EMTs) who transported him to the hospital, arguing they could impeach Officer Hart's claim that he rode in the ambulance with defendant, and that defendant was conscious during the transport. The court told defendant that he could impeach the officer with a photograph showing Officer Hart was not in the ambulance, if the officer testified to the contrary. The court explained to defendant that he could have *a* witness, but not 10 people, testify to his condition. The court denied the requested subpoenas and excluded the EMTs as witnesses.

Shortly before the conclusion of the prosecution case-in-chief, the court asked defendant for an offer of proof regarding all defense witnesses so the court could conduct an analysis under Evidence Code section 352 on whether they "are relevant or duplicative or any other legitimate reason why the Court might not allow them to testify." As to UCDMC personnel, defendant clarified he wanted to call them to show that due to his medical condition, he was not capable of admitting he swallowed the suspected narcotics.

18

Defendant identified Dr. Guenther as someone he believed could testify that defendant was incapable of giving consent to the procedure due to his traumatic condition and by implication, could not have made the admissions attributed to him.

The prosecutor interjected that she planned to introduce a portion of defendant's medical records to corroborate the testimony of the corrections officers. She further argued that the witnesses should be denied because "to call a bunch of doctors and nurses in when we really have no idea what they will be saying is a fishing expedition." According to the prosecutor, defendant could make his argument from those records, and that permitting additional medical testimony would be cumulative to them.[8] Defendant protested that he should be allowed to call one doctor to testify. Defendant hoped to create reasonable doubt by contradicting Officer Hart's testimony that he was present during the CT scan and in the operating room the whole time. The court denied all defense medical witnesses as cumulative to the medical records, stating that it would otherwise require an undue consumption of time because the doctors and nurses "would not be adding anything that's not already in the medical records."

2. Medical Records

The People introduced a set of medical records as People's Exhibit No. 45. Defendant introduced his own set of medical records as Defense Exhibit No. XX, which, contrary to defendant's claim on appeal, were admitted into evidence. These records contain the following.

Notes from the gastroenterology lab state, under clinical indications: "[S]wallowed bags of heroin." The pre-procedures indications state: "Ingestion of

---

[8]     These were introduced into evidence as People's Exhibit No. 45. The prosecutor encouraged defendant to look at the medical records to make sure what he wanted was included in the People's exhibit and, if not, defendant would have to create a defense exhibit with his required material. Defendant submitted an additional 17 pages of medical records under Defense Exhibit No. XX.

foreign body (Packets of Heroin) seen on CT scan." Findings after a CT of the upper abdomen state: "Two spherical foreign bodies are partially visualized within the stomach, which are consistent with bags of heroin reportedly consumed." A physician's note stated: "[H]e swallowed heroin packages in on CT." Several entries refer to the foreign bodies as "heroin," but do not indicate a source for this conclusion. The medical records pertaining to "Foreign body removal" stated "Informed consent was obtained within scope of trauma surgery consent" and the procedure was done immediately after the trauma surgery for the bullet wound to the chest. One document introduced by defendant stated that he was sedated for a chest tube insertion, and that "Informed Consent was not obtained because of emergent nature of the procedure." Once intubated, defendant was unable to speak.

### 3. Investigative Services Unit

The court also heard the prosecution's motion to exclude evidence regarding a scandal involving the California State Prison-Sacramento ISU. The ISU was alleged to have a pattern and practice of planting evidence and "otherwise doing inappropriate things" and the defense wished to use that information to impeach the credibility of officers working in the unit at that time. The court indicated that it had been informed that there was an ongoing Federal Bureau of Investigation probe of the ISU. The court acknowledged that if ISU officers were planting evidence at the end of the day to get overtime for report writing, that would be legitimate area of inquiry. The court stated that defendant could impeach individual officers with specific information about those same officers, but could not introduce evidence of general allegations not specific to the testifying witness.

Officer Fong was one such officer defendant hoped to impeach regarding complaints leading to his reassignment from the ISU. The prosecution twice called Officer Fong as a witness to provide evidence regarding two separate events. Officer Fong first testified regarding defendant's alleged possession of methamphetamine in

January 2018 as charged in count one, after which the court ruled Officer Fong was subject to re-call for the defense case. The prosecutor later re-called Officer Fong to testify regarding his role in taking photographs and collecting evidence after the fight in August 2018. Officer Fong testified he collected the inmate-manufactured weapon, the sheath, and the cloth handle. He also narrated the video recording of the fight. After Officer Fong testified about the fight, defendant had no questions for cross-examination. Thus, for whatever reason, defendant failed to question Officer Fong about complaints leading to his reassignment.

### 4. Evidence Code section 352

In preparation for defendant's case-in-chief, the trial court asked defendant for an offer of proof for the witnesses he intended to call. Defendant then identified he wanted to recall Michelle Stein, a CDCR nurse who had testified in the prosecution's case-in-chief. When asked, defendant could not articulate a reason for re-calling nurse Stein, other than to ask her about her observations and report from the date of the incident, both of which she had already testified to. The court told defendant there needed to be a reason to re-call witnesses, other than to have the witness repeat testimony already given, and asked defendant to identify witnesses from his list that would provide new information. Defendant then indicated he wanted to re-call Officer Ramirez who had also previously testified in the prosecution's case-in-chief. When the trial court asked defendant what different testimony he intended to elicit from Officer Ramirez, defendant responded "[t]he evidence"; the court then denied defendant's witnesses under Evidence Code section 352. The court noted the people on defendant's witness list were relevant but stated that they already testified and without some showing that they had "something new and different that the defense needs to put on before the jury," they would not be allowed to testify for the defense.

The trial court admitted defense exhibit Nos. Q (a hand-drawn sketch), GG (photographs of People's exhibit Nos. 27-30), SS (copies of photographs in People's

21

exhibit Nos. 27-28), XX (17 pages of defendant's medical records), DDD (image of yard camera) and EEE (coroner's report).

   *B.  Analysis*

   Claiming that the trial court's ruling violated his rights under the federal and California Constitutions to present a defense, to confront and cross-examine witnesses, to due process, and to a fair trial, defendant asserts that prejudice must be evaluated under the standard for federal constitutional error established in *Chapman v. California* (1967) 386 U.S. 18.  However, *Chapman* applies in the context of state evidentiary error only when the error completely deprives a defendant of a " ' 'meaningful opportunity to present a complete defense.' ' " (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1072, citing *Crane v. Kentucky* (1986) 476 U.S. 683, 690.)  And "[a]pplication of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense." (*People v. Snow* (2003) 30 Cal.4th 43, 90; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1450.)  Here, the trial court's rulings did not constitute a refusal to allow defendant to present a defense but merely rejected certain evidence concerning his defense.

   None of defendant's excluded evidence was central to a claim of innocence; he admitted his only goal was to create reasonable doubt through impeachment.  The video showed his involvement in the fight, which resulted in undisputed injuries that required treatment at UCDMC.  There, it was also undisputed that medical tests revealed the presence of two foreign objects in his stomach, which were removed and analyzed.  Even if evidence was produced showing that the ISU reports regarding the fight contained falsehoods or that he did not actually admit to swallowing the two foreign objects, such evidence would not contradict the recovery of heroin from his abdomen and thus his actual possession of the heroin.  Because the trial court merely *rejected* some evidence concerning a defense, and did not preclude defendant from presenting a defense, any

22

error is one of state law and is properly reviewed under *Watson*. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)

However, we conclude the trial court erred in denying defendant's medical witnesses without first affording him an opportunity to establish the foundation for their testimony pursuant to Evidence Code section 402. The purpose of such a hearing is to decide preliminary questions of fact upon which the admissibility of evidence depends. (*People v. Superior Court* (*Blakely*) (1997) 60 Cal.App.4th 202, 209, fn. 6.) At a hearing pursuant to Evidence Code section 402, "[t]he proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact . . . ." (Evid. Code, § 403, subd. (a).) Here, the "proffered evidence" was evidence that Officer Hart lied about defendant admitting to swallowing bags of heroin. The "preliminary fact" was whether defendant admitted to such, or was capable of making such admission. (See Evid. Code, §§ 400, 401 [defining " 'preliminary fact' " and " 'proffered evidence' "].) If defendant had been able to produce evidence at the hearing that, if believed by a jury, would be sufficient to challenge Officer Hart's credibility, such evidence should have gone to the jury.

The prosecutor argued the witnesses should be denied because the nature of their testimony was unknown or was cumulative to the evidence contained in the medical records. By definition, if the nature of the testimony is unknown, it cannot be said to be cumulative to the evidence in the records or require an undue consumption of time. Defendant sought to cast doubt on Officer Hart's credibility by impeaching him with testimony from a physician that defendant never admitted swallowing the heroin, as Officer Hart claimed. Even if the medical records reflected that defendant could not provide informed consent for the surgical procedures due to his traumatic condition, that fact does not necessarily refute Officer Hart's claim that defendant admitted he

23

swallowed the drugs. By failing to afford defendant the opportunity to establish the foundation for medical personnel's testimony before the jury, the trial court abused its discretion.

We review errors in the application of the "ordinary rules of evidence" such as Evidence Code section 352 under the standard set forth in *Watson, supra*, 46 Cal.2d at page 836. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.) Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Watson*, at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Here, there is no reasonable probability the exclusion of the witnesses affected the result. The evidence supporting the judgment is strong. A video recorded defendant's attack of Rodriguez in the yard, and defendant was treated for his wounds resulting from that altercation. As part of that treatment, two bindles of heroin were found in, and removed from, defendant's stomach. The evidence defendant sought to introduce had impeachment value, but it would not have had the sufficient weight to overcome the evidence against defendant.

Officer Hart testified that he overheard defendant talk to medical personnel either during or after the CT scan revealed the foreign bodies. It is unlikely the EMTs would be able to corroborate or refute that, as there would have been no reason for them to be near the CT scan. Even if the EMTs could have verified defendant's claim that he was unconscious or otherwise incapable of speech on the ride to the hospital, that does not

24

mean defendant remained in that state. Thus, the relevancy of the proffered evidence from the EMTs was extremely low.

Even if the medical personnel could verify defendant's claim that he never admitted to swallowing the two bindles, the uncontested fact remains that two foreign bodies were found in, and removed from, his stomach. Testing confirmed they were heroin. The strong circumstantial evidence — even without his admission — leads to the inference that defendant swallowed them. With or without Officer Hart's testimony, the medical records support the inference that defendant swallowed them.

Finally, defendant was allowed to impeach officers regarding the ISU scandal if he had evidence pertaining to the relevant officer. Defendant proffered no such evidence. Thus, there is no evidence to consider. Notably, although defendant specifically sought to challenge Officer Fong's testimony, defendant abandoned those efforts when he asked no questions after Officer Fong testified about the fight. Yet even if we were to assume defendant could have provided evidence that members of the ISU involved in this case wrote reports containing falsehoods, those falsehoods would not call into question the two uncontested facts here: defendant was involved in the fight and two bindles of heroin were found inside him.

In weighing the relatively strong evidence supporting the existing judgment against the comparatively weak evidence supporting a different outcome, we conclude that there is no reasonable probability the error of which defendant complains affected the result. (See *People v. Beltran, supra*, 56 Cal.4th at p. 956.)

IV

*Cumulative Error*

Defendant asserts that the cumulative effect of the errors he alleges prejudiced him, mandating reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-

1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.)  A defendant is "entitled to a fair trial but not a perfect one."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  Defendant was not deprived of a fair trial.  Although we have found the trial court erred by failing to order the pretrial disclosure of the coroner's report and by failing to afford defendant the opportunity to establish the foundation for certain witnesses' testimony prior to excluding them, as we explained *ante*, defendant was able to argue his defense.  In light of the evidence of his guilt, there is no reasonable probability that with the correct rulings the outcome of defendant's case would have been more favorable to him.

## DISPOSITION

The judgment is affirmed.

/s/
EARL, P. J.

We concur:

/s/
RENNER, J.

/s/
MESIWALA, J.

26